H. P. BRAWNER AND A. L. BRAWNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brawner v. Commissioner
Docket No. 24471-84.
United States Tax Court
T.C. Memo 1987-581; 1987 Tax Ct. Memo LEXIS 584; 54 T.C.M. (CCH) 1147; T.C.M. (RIA) 87581; November 23, 1987; As amended November 24, 1987 Joyce K. Hackenbrach and Lisa B. Petkun, for the petitioners. Dermont F. Kennedy, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Addition to Tax
Year
Deficiency
Under 6653(a)
1976
$ 5,467
$   0
1977
3,172
159
1978
2,387
119
1979
1,983
99
1980
1,362
0
The issues for our consideration are: (1) Whether petitioners are entitled to deductions for depreciation and other items, and investment tax credit attributable to their interest in the limited partnership, Vancom Films, Ltd.; (2) whether petitioners are liable for additions to tax pursuant to section 6653(a); (3) whether petitioners *586 are liable for additional interest pursuant to section 6621(c); [1] and (4) whether petitioners are liable for damages pursuant to section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts and attached exhibits are incorporated herein by this reference. H. P. Brawner and A. L. Brawner, husband and wife, were residents of Media, Pennsylvania, at the time of filing the petition herein. Petitioners timely filed joint Federal income tax returns for the calendar years 1976, 1977, 1978, 1979 and 1980, using the cash receipts and disbursements method of accounting. During the years in issue, H. P. Brawner was a sales engineer and A. L. Brawner was a housewife. [2]
*587 This controversy arose out of petitioner's 1976 purchase of a 3.8-percent limited partnership interest in Vancon Films, Ltd. (Vancon), and the deductions petitioners claimed as their distributive share of the losses and investment tax credit attributable to that interest. Sometime during the summer of 1975, Albert S. Pitts (Pitts), the sole partner of and a limited partner in Vancon, met Paul Freedman (Freedman) at Pitts' dentist's office. At that time, Pitts, a certified financial planner with approximately 15 years of experience in financial planning, was both president and owner of Executive Design Investments, a broker-dealer firm. Freedman was comptroller of Counselor Films, Inc. (CFI). [3] When Freedman learned that Pitts was a certified financial planner, Freedman informed Pitts that his company was interested in obtaining financing for five educational films, and inquired whether Pitts might be interested in pursuing the investment. Although the films were scripted at the time, they had not yet been produced. *588 In late August and again in early September 1975, Pitts met with Freedman and other officers of CFI, including Ralph Lopatin (Lopatin) and Steve Levine (Levine) [4] to discuss these films. Consequently, Vancon, a limited partnership, was formed under the laws of Pennsylvania. Vancon was established to purchase and market the five educational films. Interest in Vancon were properly registered to be sold under the laws of Pennsylvania. A total of 25 units were offered for sale at a price of $ 10,000 each, for a total capital of $ 250,000 to be received from investors. Each unit represented a 3.8-percent interest in capital and profits and losses; the general partner was entitled to the remaining 5 percent. Pitts was the sole general partner of Vancon, [5] and held a limited partnership interest as well. [6] Pitts, as general partner of Vancon, retained R. L. Stevens & Company, Inc. (RLS), a broker-dealer firm, to privately place units of Vancon by offering them to individuals as investments. [7]RLS received a lump sum of $ 25,000 and the $ 5,000 previously *589 paid to Pitts by CFI pursuant to a consulting arrangement for his services in Vancon's formation. [8] Robert Stevens and RLS and Pitts both sold units in Vancon and received a sales commission for each unit sold. [9] As of January 30, 1976, Pitts has sold two-thirds of all the units sold in Vancon. Pitts later became a vice-president of RLS. The production of the five educational films were completed in late 1975 for a cost of about $ 150,000. [10] The film production was done by Ralph Lopatin Productions, *590 Inc. (Lopatin Productions), [11] which sold the films to CFI for $ 150,000. [12] Each film was about 11 to 12 minutes in length, and used unknown casts. At the time of this purchase CFI was the distributor of 141 films, 58 of which it produced and owned and 83 of which it distributed for others. CFI's distribution services were primarily conducted through a sales force. In September 1975, Pitts entered into an option, on the behalf of Vancon, to purchase the five films. During December 1975, Pitts viewed unedited clips from the films. In January 1976, Vancon entered into a purchase agreement *591 with CFI to acquire the five films for a total price of $ 700,000. [13] The purchase price was payable as follows: $ 170,000 in cash on or before the closing, and the balance ( $ 530,000) financed by two nonrecourse notes each bearing 6-percent interest per annum. [14] This financing method was unique to CFI. Vancon was obligated to pay the full purchase price; up to the date of trial no principal payments had been made on the notes. [15] Never before in the history of their existence had CFI sold films using nonrecourse financing. The five films were grouped into two series: the vandalism series "Fun or Dumb," [16] and the consumer education series "Kids and Cash." [17] Of the total purchase price, $ 420,000 was allocated to the vandalism series, and $ 280,000 to the consumer education series. [18] No evidence has been submitted to explain or support the markup of the films from the *592 $ 150,000 sales price used late in 1975 (sale between Lopatin Productions and CFI) to the $ 700,000 assigned to the same films in the spring of 1976 (sale between CFI and Vancon). [19] Although Pitts knew that the production cost was $ 150,000, he did not make any inquiries about the average markup in the industry for films of this type. [20]CFI, the sole distributor of Vancon's films, acted as the distributor for these films until CFI's bankruptcy in 1981. *593 As part of the purchase agreement, CFI agreed to use its best efforts to assist Vancon in obtaining the services of all its sales representatives to market the five films purchased by Vancon. [21] All of CFI's sales representatives entered into "sales representative agreements" with Vancon [22] agreeing to act as Vancon's sales representatives with respect to the vandalism and consumer education series. Each sales representative was to be paid a commission of 25 percent of the purchase price of each film sold. [23] The sales representative sold films of other companies, including [Text Deleted by Court Emendation] CFI. Prior to contacting the sales representatives, Pitts, who expected to rely significantly on the sales efforts of the representatives for the success of Vancon, did not investigate how many other lines of films a particular representative was carrying. The amount of time, if any, the representatives spent selling Vancon's films was unknown to Pitts, and he did not know nor did he make any attempt to insure that the sales representatives were supplied with demonstration copies. *594 Pitts, the general manager of Vancon and the individual responsible for the success of the partnership, had no prior experience in the acquisition or distribution of educational motion picture films or in the education of school children. Although the primary market for the films was public and private schools, Pitts had not knowledge of the total number of schools to which the films were targeted, nor did he know any of the purchasing agents for such schools. [24] Pitts did not know that the total sales volume for educational films was in 1976. He was unaware of whether there was an increase or decrease in sales in the educational film market on a yearly basis during 1976, 1977 and 1978. [25]
Potential limited partners of Vancon were given a private offering memorandum (Memorandum) to which was attached sales projections (Projections) for the vandalism and consumer education series. The Memorandum represented that investment in Vancon "should *595 be considered only by investors who have income subject to Federal income tax at the rate of 50 percent or more and whose current net worth is not less than $ 200,000 * * * [and] is not appropriate for persons seeking a significant cash return on their investment." [26] (Emphasis added.) The Memorandum also represented that Pitts, the general partner, would receive a management fee of between $ 5,000 and $ 15,000 and made it clear that he had no prior experience in the acquisition or distribution of motion picture films or in the education of school children. The sales projections were prepared by Harvey Grossman of Silver & Company, a certified public accounting firm, from figures developed by Pitts and Freedman. [27] The principal purpose of the sales projections was to satisfy the requirements of the Pennsylvania Security and Exchange Commission to secure their permission to sell interests in Vancon. The cover statement accompanying the Memorandum clearly stated that the *596 Projections were not intended to be predictions of actual or anticipated results of the partnership operations. [28] The Projections contained three varying sales levels of a minimum, an average and a maximum. These sales figures were purportedly based on CFI's experience in marketing its films and the number of school districts served by CFI's sales force. Petitioner purchased his interest in Vancon during 1976 for $ 10,000. The subscription for his unit was payable in two installments: one-half of the price was due upon subscription; the other one-half was payable on or before September 23, 1976. Petitioner's distributive share of Vancon's losses for the years 1976 through 1980 was $ 5,804, $ 6,913, $ 5,442, $ 4,478 and $ 2,579, respectively. Additionally, petitioner claimed an investment tax credit of $ 2,800 in 1976. Respondent disallowed the claimed losses and the *597 investment tax credit asserting various alternative theories under which the claimed deductions would be disallowed. Respondent argues that petitioner's investment in Vancon lacked economic substance, was motivated solely by tax-avoidance and should be disregarded for tax purposes. Alternatively, respondent argues that Vancon, and consequently petitioner, was not engaged in the activity for a profit nor was it a trade or business for the years in issue. [29] Petitioners contend otherwise. OPINION Petitioners have the burden of proving that respondent's determinations are incorrect. Welch v. Helvering,290 U.S. 111 (1933). To qualify for the claimed deductions and investment tax credit petitioners must show that Vancon's activities were a trade or business for the years involved, or at a minimum that their investment in Vancon was undertaken for the purpose of making a profit. See Beck v. Commissioner,85 T.C. 557, 569 (1985), *598 and the cases cited therein. Losses and Investment Tax Credit
The theories advanced by respondent for disallowing the claimed deductions and investment tax credit are overlapping and cumulative, therefore we have applied the approach set forth in Rose v. Commissioner,88 T.C. 386 (1987), to the facts of the instant case. In Rose, a unified approach was used to analyze transactions which can be classified as "generic tax shelters." Under this approach the subjective (business purpose) and objective (economic substance) tests merge incorporating factors considered relevant in cases decided under section 183, as well as factors applied to transactions being tested for economic substance. In determining whether this transaction will be disregarded for income tax purposes we must first examine petitioners' motives for entering the transaction. Although taxpayers are generally free to structure their business transactions as they please, even if motivated by tax avoidance, such transactions will be disregarded for tax purposes if they are entered into without any economic, commercial or legal purposes other than hoped for tax benefits. Rice's Toyota World, *599 Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. 752 F.2d 89 (4th Cir. 1985); Frank Lyon Co. v. United States,435 U.S. 561 (1978); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). Petitioners contend that Vancon's activities, and consequently their investment in Vancon, were engaged in for a profit and that the deductions generated through losses and the investment tax credit were incidental to the business activities. We find this argument unconvincing and not supported in the record. Vancon purchased for $ 700,000 films that were produced for a total cost of $ 150,000. It also incurred administrative costs, agreed to pay its general manager, Pitts, a management fee of between $ 5,000 and $ 15,000, and contracted to pay each sales representative 25 percent of his or her total sales of the partnership's films. These facts reveal, without any in-depth analysis, that a profit could be anticipated only if Vancon could realistically expect estimated sales in excess of $ 1,000,000. Vancon, however, made no serious attempt to forecast any realistic sales. Vancon's general manager was *600 totally unaware of the size of the potential market for the films and any competition that the films would face. More importantly, the sales projections that were sent to potential investors were prepared mainly to qualify interests in the partnership for sale under the Pennsylvania Security and Exchange requirements. The cover letter received by each potential investor, including petitioner, clearly warned the investors that the sales figures set forth in the projections were not to be considered as predictions of actual or anticipated sales. Furthermore, the Memorandum sent to the potential investors included the statement that the sales force for Vancon's films distributed and sold films produced and distributed by CFI and other companies; therefore, there could be no assurance that the sales force would aggressively or successfully distribute Vancon's films. It also included a suggestion that a more effective distribution of the films would result from hiring an independent national distributor. It also contained the warning that a great burden and responsibility for the success of the films would be on the general manager, an individual whose lack of qualifications was evident *601 from the Memorandum. Additionally, the Memorandum contained the caveat that any investment in the partnership "should be considered only by investors who have income subject to federal income tax at the rate of 50% or more and whose current net worth is not less than $ 200,000" and that the investment was not appropriate for taxpayers seeking a significant cash return on their investment. In addition, the Memorandum warned that there was a significant risk of loss involved in the investment and that investors should be prepared and financially able to sustain a complete loss of their investment. The determination of profit-making intent is one of the facts to be resolved using all relevant surrounding facts and circumstances; no one factor is determinative. Allen v. Commissioner,72 T.C. 28, 34 (1979). In view of the above facts we find it difficult to comprehend how petitioners, or anyone else, could have an actual and honest objective for profit in regards to this activity. Petitioners' insistence on our acceptance of their argument that they, or Vancon, entered into this activity with the intent of making a profit strains all credulity. [30]
*602 Petitioners' failure to establish that a transaction was motivated by a business purpose rather than by tax avoidance is not conclusive that the transaction will be disregarded for tax purposes. If an objective analysis of the transaction indicates that a reasonable possibility of profit existed apart from tax benefits, the transaction will not be classified as devoid of economic substance. Rice's Toyota World, Inc. v. Commissioner, supra at 203 n. 17; Frank Lyon Co. v. United States, supra at 583-584. An objective analysis of the transaction is made by applying the objective test. In applying this test we have held that the following factors are key indicators of the presence or lack of economic substance: (1) The presence or absence of arm's-length price negotiations; (2) the relationship between the sales price and the fair market value; (3) the structure of financing of the transaction; (4) whether there was a shifting of the benefits and burdens of ownership; and (5) the degree of adherence to the contractual terms. Rose v. Commissioner, supra at 410-411, and the cases cited therein. The transaction involved herein is devoid of any *603 arm's-length price negotiations. The five educational films purchased by Vancon were produced by Lopatin Productions for a total cost of $ 150,000. Late in 1975, shortly after the films were completed they were sold to CFI, a company in which the owner of Lopatin Productions was the majority shareholder, for $ 150,000. In the spring of 1976, the films were sold to Vancon for $ 700,000. With respect to price negotiating, Pitts testified that he had no idea what the average markup was in the industry for films such as the ones involved in the instant case. Pitts made no inquiries as to such facts nor did he expend any time or effort trying to educate himself on the fair market value of such films. Pitts testified that even though they were aware of the production cost being $ 150,000, when the $ 700,000 purchase price was quoted, he accepted the price without any inquiries. This type of behavior does not support a finding of an arm's-length negotiation. Neither party made any effort to negotiate. Additionally, we find that the price of the films was grossly inflated. The films were not of exceptional quality; both the script writers and the cast were unknown. CFI, the sole *604 distributor of the films, cautioned in the Memorandum that they could not ensure aggressive or successful distribution efforts for any of the films and stated this would have a direct impact on the anticipated success of the partnership. [31]CFI suggested that it would be more advantageous to Vancon to secure an independent distributor. Mindful of these factors, CFI secured a cash payment of $ 170,000, upon execution of the sale, thus locking in their $ 20,000 profit on the front end of the transaction. The two nonrecourse notes executed for a total of $ 530,000 were added solely to inflate the purchase price, and consequently the basis of the films for purposes of depreciation and interest payment deductions, and the investment tax credit ultimately passed on to Vancon's partners. Although CFI was fully aware of the possible failure of the films, they were willing to take notes secured only by the films and any proceeds derived from film sales. We can only determine that CFI considered themselves as having secured a reasonably anticipated profit of $ 20,000, with any gains in excess of this to be "frosting on the cake." *605 The fact that this was the first and only transaction CFI financed using nonrecourse notes casts further doubt on the genuineness of the transaction. Furthermore, up to the date of trial no principal payments had been made on the notes and CFI made no efforts to collect such amounts. In light of all these surrounding facts we hold that this transaction is devoid of economic substance and will be, therefore, disregarded for income tax purposes. Additions to Tax - Section 6653(a)
Respondent has determined additions to tax under section 6653(a) for the years 1977, 1978 and 1979 in the amounts of $ 159, $ 119 and $ 99, respectively. [32] Section 6653(a) provides for an addition to tax in the amount of 5 percent of any underpayment if any part of the underpayment "is due to negligence or disregard of rules or regulations * * *." Petitioners have the burden of proving that their underpayment of taxes was not the result of their negligence or intentional disregard of these rules and regulations. Courtney v. Commissioner,28 T.C. 658, 669-670 (1957). Negligence, within the meaning of section 6653(a), is the lack of due care or failure to do what a reasonable and *606 ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners did not testify at trial and the record will not support a finding that petitioners overcame the presumption of correctness attached to respondent's determination with respect to this addition to tax. Nothing in the record even suggests that petitioners sought any independent information about the investment of the return on this investment. The investment package presented the possibility of substantial deductions and a tax credit and this was petitioners' primary or sole purpose in "investing" in this activity. Such conduct on the part of petitioners supports a finding of negligence and intentional disregard of these rules and regulations. We hold that petitioners are liable for the additions to tax pursuant to section 6653(a) for the years 1977, 1978 and 1979. Additional Interest - Section 6621(c)
Section 6621(c) provides, *607 in general, that the annual rate of interest shall be 120 percent of the established rate with respect to any substantial underpayment (exceeding $ 1,000) attributable to tax motivated transactions. The increased interest rate, where applicable, applies with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Sec. 144(c), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 682; Stanley Works v. Commissioner,87 T.C. 389 (1986); Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The definition of a tax motivated transaction includes "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). [33] A sham or fraudulent transaction is a transaction that is devoid of economic substance and is disregarded, therefore, for income tax purposes. Inasmuch as we have determined that the transaction involved herein is devoid of economic substance and is to be disregarded for tax purposes, the "sham or fraudulent transaction" requirement of section 6621(c)(3)(A) has been met. See Patin v. Commissioner,88 T.C. 1086 (1987). *608 We find that petitioners are liable for additional interest under section 6621(c). Damages - Section 6673
Section 6673 provides: Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay, that the taxpayer's position in such proceeding is frivolous or groundless, or that the taxpayer unreasonable failed to pursue available administrative remedies, damages in an amount not in excess of $ 5,000 shall *609 be awarded to the United States by the Tax Court in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the Secretary and shall be collected as a part of the tax. Respondent, by motion, requests that we award damages to the United States in the amount of $ 5,000. However, it must first appear to us that petitioners have instituted or maintained this proceeding primarily for delay or that petitioners' position in this proceeding is frivolous or groundless. We do not find these characteristics to be present in this case. Although we have found the transaction to be devoid of economic substance, we do not find petitioners' position to be frivolous or groundless. We have determined that petitioners lacked due care and did not take the steps an ordinary and prudent person would have taken with respect to claiming the deductions and investment tax credit attributable to their investment in Vancon. However, the lack of prudence does not convert petitioners' arguments into meritless contentions. Accordingly, we decline to award damages under section 6673. Based on the foregoing, Decision will *610 be entered for respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. Subsec. (d) of sec. 6621 was redesignated as subsec. (c) and amended by sec. 1511(c)(1)(A)-(C), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. ↩
2. A. L. Brawner is a party to this action solely by filing a joint return with her husband, H. P. Brawner. All references to petitioner, singularly, are to H. P. Brawner. ↩
3. As comptroller of CFI, Freedman was responsible for its financial management, budget preparation, and payment approval. Prior to joining CFI, Freedman had no knowledge or experience in the educational film business. He had worked in private practice as a certified public accountant. CFI was formed in 1972 as a distributor of educational films, and from 1970 through 1975 developed a good reputation for marketing educational films. As of Jan. 1976, CFI had 141 films for distribution. ↩
4. At the time, Levine was the national marketing director and vice-president of CFI. Levine later became president of CFI. ↩
5. Pitts, the sole general partner of Vancon, was permitted to engage in activities that were contrary to the interest of Vancon. ↩
6. Pitts received the remaining 5-percent interest in capital and profits and losses in exchange for a cash contribution of $ 100. ↩
7. The units were being offered solely through broker-dealers. ↩
8. Although Pitts' firm, Executive Design Investments, Inc., had previously offered a different structuring of Vancon's formation and had agreed to act as broker-dealer in placing the units, no services in this capacity were rendered by either and no compensation received. ↩
9. RLS paid Pitts the commission for the units he sold, individually. ↩
10. The five films appeared in CFI's 1975 school year catalog which was distributed to potential customers. CFI agreed to provide, and did provide, prints to potential purchasers for preview purposes prior to the sale of the same films by CFI to Vancon. ↩
11. Ralph Lopatin was president of Lopatin Productions and had extensive experience in film production. ↩
12. Ralph Lopatin was the sole shareholder of Lopatin Productions, Inc., and was also the majority shareholder of Counselor Films, Inc. At the time of completion of the films involved herein, CFI had been in existence for 4 years. ↩
13. The purchase agreement of Jan. 1976 was not funded until May 1976. ↩
14. In the event of default on either note, the holder's sole recourse was to proceed against the film series to which the note related. ↩
15. A total of $ 80,000 interest was paid on the notes which were due Mar. 31, 1976. ↩
16. The films in this series focused on the effects of graffiti, arson and other forms of vandalism, and attempted to discourage students from engaging in said activities. ↩
17. The two films in this series dealt with basic concepts of money management, saving and conservation of monetary resources. ↩
18. Of the cash paid at the closing, $ 45,000 was allocated to the vandalism series and $ 25,000 was allocated to the consumer education series. An additional $ 60,000 was paid on the vandalism series and $ 40,000 on the consumer education series before Sept. 30, 1976. The balance of the purchase price was represented by two nonrecourse notes as follows: (1) $ 315,000 on the vandalism series, and (2) $ 215,000 on the consumer education series. ↩
19. Freedman testified that the $ 700,000 purchase price was arrived at by taking an estimation of what CFI thought might be revenues from future sales using a 7 to 10-year projection. They did not do an exact present value calculation. ↩
20. On cross-examination, Pitts testified that they did not negotiate the purchase price. They were told what the price was and they accepted it. ↩
21. In a confidential memorandum CFI clearly stated that it owned, distributed and sold other education motion picture films to the same customers to which Vancon's films were directed. CFI also warned that because it owned and sold a substantially greater number of films than Vancon there was no assurance that Vancon's films would receive the same distribution energies and opportunities as if they were distributed by a company without any affiliation with CFI. ↩
22. A total of 18 sales representatives who worked for CFI signed written agreements with Vancon. They worked as independent contractors for Vancon. ↩
23. The "sales representative agreements" were effective from Dec. 26, 1975, and expired 1 year from that date. These agreements identified the sales territory to which each sales representative was assigned. None of the agreements were removed upon expiration. ↩
24. CFI supplied Pitts with a mailing list of schools which identified approximately 1,450 schools or school systems. ↩
25. Pitts was unaware of the competition Vancon's films would face and the success rate of any competing films. ↩
26. The Memorandum also warned that there was a significant risk of loss involved in the investment, therefore investors should be prepared and able to sustain a complete loss of their investment. ↩
27. At the time of preparing the figures for the sales projections, Freedman had only 5 months of experience with CFI and no previous experience in the educational movie business. ↩
28. Pitts testified that the sales projections were intended to show the limited partners a range of income possibilities. ↩
29. Respondent also contends that the price Vancon paid for the five films, a combination of cash and nonrecourse notes, exceeded the fair market value of the films, therefore the nonrecourse notes must be excluded from the films' basis for purposes of depreciation. ↩
30. Petitioner contends that taking into account the $ 700,000 purchase price of the films, and assuming vigorous distribution efforts, it could reasonably be anticipated that the Vancon films would yield a profit. This contention ignores the information clearly set forth in the Memorandum which warns that CFI cannot ensure aggressive or successful distribution efforts. ↩
31. By reason of simple deductive reasoning Pitts should have been aware of the impact these factors would have on the fair market value of the films. ↩
32. Respondent did not determine additions to tax under sec. 6653(a) for the years 1976 or 1980. The record does not reflect any supporting reason; however, it does not affect our determination of this issue. ↩
33. Sec. 6621(c)(3) provides, in pertinent part, as follows: (3) Tax motivated transactions. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in substantial distortion of income for any period, and (v) any sham or fraudulent transaction. ↩