**RICE'S TOYOTA WORLD, INC.**
**(Formerly Rice Auto Sales,**
**Inc.), Appellant,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE, Appellee.**

**No. 84–1246.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 1, 1984.

Decided Jan. 7, 1985.

William L. Tankersley, III, Greensboro, N.C. (J. Reed Johnston, Jr., Tuggle, Duggins, Meschan & Elrod, P.A., Greensboro, N.C., on brief) for appellant.

Bruce R. Ellisen, Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Tax Div., Dept. of Justice, Washington, D.C., on brief) for appellee.

Before HALL, PHILLIPS, and SPROUSE, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Rice's Toyota World (Rice) appeals the Tax Court's decision upholding the Commissioner's disallowance of interest and depreciation deductions that Rice took on income tax returns filed for 1976, 1977 and 1978 on the basis that underlying sale and leaseback transactions were, for tax purposes, a sham. We affirm disallowance of the depreciation deductions and a portion of the interest deductions; but we reverse disallowance of a portion of the interest deductions.

I

In form the transactions in issue involved the sale and leaseback of a used computer and financing of the purchase by secured

recourse and nonrecourse notes payable to the seller. The principal officer of Rice, a company primarily engaged in the sale of automobiles, learned about computer purchase-and-leaseback transactions through a friend who had already entered into a similar transaction through Finalco, a corporation primarily engaged in leasing capital equipment. Rice's accountant contacted Finalco to request information, and Finalco mailed Rice literature describing potential transactions. Finalco's literature noted that the transactions generate large tax losses in early years because the purchaser could claim depreciation deductions calculated under accelerated depreciation provisions as well as interest expense deductions. The transactions produce income in later years as depreciation deductions decrease.

After meeting with a Finalco representative, Rice purchased a used computer from Finalco in 1976 for a total purchase price of $1,455,227, giving Finalco a recourse note in the amount of $250,000 payable over three years,[1] and two nonrecourse notes in the amount of $1,205,227 payable over eight years. Finalco had recently purchased the used computer for $1,297,643.

Rice leased the computer back to Finalco for a period of eight years, beginning in 1976. Under the lease, rental payments exceeded Rice's obligations on the nonrecourse debt by $10,000 annually. Finalco's obligations to pay rent were made contingent on its receiving adequate revenues in subleasing the computer. At the time of Rice's purchase and leaseback of the computer, Finalco had arranged a five year sublease of the computer. Finalco was entitled to 30 percent of proceeds generated if it arranged re-lease or sale of the computer after expiration of the five year sublease.

Rice paid off the $250,000 recourse note in three years along with $30,000 in inter-est on the deferred installments. On its income tax returns for 1976, 1977, and 1978, it claimed accelerated depreciation deductions based upon its ownership of the computer, and interest deductions for its payments on the notes.

The tax court upheld the Commissioner's disallowance of all the depreciation deductions and the interest expense deductions based on both the recourse and nonrecourse notes because the court found that the sale and leaseback was a sham transaction that the Commissioner is entitled to ignore for tax purposes. *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983). The tax court found as fact that Rice was not motivated by any business purpose other than achieving tax benefits in entering this transaction, and that the transaction had no economic substance because no reasonable possibility of profit existed. *Id.* at 200–10. The court accordingly held as a matter of law that the transaction should be treated for tax purposes as if Rice paid Finalco a fee, in the form of the cash payment of $62,500 made on the recourse note in the year of purchase,[2] in exchange for tax benefits. *Id.* at 207 and 210.

This appeal followed.

## II

The tax court read *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), to mandate a two-pronged inquiry to determine whether a transaction is, for tax purposes, a sham. To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists. *Rice's Toyota*, 81 T.C. at 209; *see also Hilton v. Commissioner*, 74 T.C. 305, 349–50 (1980), *aff'd per curiam*

---

1. The note was payable in four principal installments of $62,500, with interest on unpaid balances, the first due in 1976, the year of purchase. The tax court treated Rice's first payment of $62,500, actually made contemporane-ously with execution of the back-dated note, as a "cash down payment." *See Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 207 and 210.

2. *See supra*, n. 1.

671 F.2d 316 (9th Cir.1982). We agree that such a test properly gives effect to the mandate of the Court in *Frank Lyon* that a transaction cannot be treated as a sham unless the transaction is shaped solely by tax avoidance considerations. *See* 435 U.S. at 583–84, 98 S.Ct. at 1303–04.

■ Whether under this test a particular transaction is a sham is an issue of fact, and our review of the tax court's subsidiary and ultimate findings on this factual issue is therefore under the clearly erroneous standard. *Boyter v. Commissioner*, 668 F.2d 1382, 1388 (4th Cir.1981). Applying that standard, we affirm the tax court's findings on the sham issues.

### A

The business purpose inquiry simply concerns the motives of the taxpayer in entering the transaction. The record in this case contains ample evidence to support the tax court's finding that Rice's sole motivation for purchasing and leasing back the computer under the financing arrangement used was to achieve the large tax deductions that the transaction provided in the early years of the lease.[3]

First, the record supports the court's subsidiary finding that Rice did not seriously evaluate whether the computer would have sufficient residual value at the end of the eight year lease to Finalco to enable Rice to earn a profit on its purchase and seller-financed leaseback. Under the purchase and lease agreements with Finalco, Rice was obligated to pay (and did pay) $280,000 to Finalco in the form of principal and interest on the recourse note. Finalco's rental payments provided Rice with a return on the investment of $10,000 annually after payment of Rice's principal and interest obligations under the nonrecourse

notes. At the time of the lease, Rice could therefore be certain of receiving a $50,000 return since Finalco had subleased the computer for five years, but Rice could recover the additional $230,000 of its investment only if it could re-lease the computer after five years or realize a substantial amount by its sale. Profit on the transaction therefore depended upon re-lease or sale because Finalco had no obligation to pay rent under its lease unless it received adequate revenues in subleasing the computer. Moreover, the sale and leaseback agreement gave Finalco a "marketing fee" of 30 percent of re-lease or sale proceeds if Finalco arranged the subsequent deal, thereby increasing further the amount Rice had to receive on re-leasing or selling the computer to earn a profit.

Residual value of the computer (either in selling or releasing) should therefore have been the crucial point of inquiry for a person with a business purpose of making a profit on this transaction. However, Rice's principal officer knew virtually nothing about computers, and relied almost exclusively on the representations of a Finalco salesperson regarding expected residual value. Despite the Finalco representative's frank concession that he was not an expert in predicting residual values, Rice did not pursue the representative's offer to provide an expert appraisal of likely residual value. Rice's accountant advised that the transaction appeared to be profitable, but the record does not reveal that the accountant's opinion reflects anything more than the fact that the transaction, if successful, would generate large tax deductions. Although Rice had in its possession a report containing a chart that showed a possibility that the computer would have sufficient residual value to earn Rice a profit, the report warned of great risk in predicting

---

**3.** Finalco's literature projected losses of $782,063 during the first five years of the transaction, and Rice reported net losses of approximately $600,000 during the three years following his purchase. During the years immediately following Rice's purchase depreciation deductions are much larger than in later years due to accelerated depreciation provisions. In addition, interest expense deductions fall as the debt balance falls during the course of the lease. However, the transaction would produce net income for Rice in later years, and therefore, if Rice saw the transaction through to completion, it would receive a mere deferral of tax liability.

residual values, and also showed a large possibility of losses on the transaction.[4]

The record contains additional support for drawing the ultimate inference that Rice was not motivated by potential profit. First off, Finalco's literature emphasized the large tax deductions the transaction would produce, not the potential for profit. To the contrary, the literature warned of great difficulty in predicting residual values.

More critical is the evidence that Rice paid an inflated purchase price for the computer: $1,455,227 for a used computer that Finalco had recently purchased, in an already declining market, for only $1,297,643. Considering that Finalco had a right to 30 percent of re-leasing or sale proceeds after five years, Rice can more accurately be said to have purchased for this amount only 70 percent of a computer, then worth less than $1,000,000. Because Rice paid so obviously inflated a purchase price for the computer and financed the purchase mainly with nonrecourse debt, it was properly inferable by the tax court that Rice intended to abandon the transaction down the road by walking away from the nonrecourse note balance before the transaction ran its stated course. *See Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048–49 (9th Cir.1976); *Rice's Toyota*, 81 T.C. at 209. The inference is amply supportable that this intended course of conduct explains Rice's apparent lack of concern with residual value or profitability of the transaction apart from tax benefits.

Rice points to several items of evidence supporting a contrary inference in respect of profit motivation. A report prepared for trial by an expert witness demonstrated that if Rice remained in the transaction until completion without walking away from the nonrecourse debt, Rice's tax benefit from early-stage deferral of taxes would amount to less than a normal rate of return on its investment. Rice contends that since it knew that the benefit from tax deferral would not amount to a normal return, it must have intended to profit from the transaction apart from tax benefits. While that factual inference was possible, it surely was not compelled on the record before the tax court. For, as will appear, Rice's knowledge of the tax consequences of a wholly consummated transaction is at least equally compatible with the inference drawn by the tax court: that Rice did not intend that it would be fully consummated with attendant full tax consequences.

Rice's main reliance on the report is upon its warning that its tax benefits would ultimately be limited because of realization of taxable "phantom income" in later years of the overall transaction. Specifically, the report indicated that although Rice would receive artificially large depreciation deductions in early years due to accelerated depreciation provisions, it would receive artificially low deductions in later years as basis was used up, thereby resulting in "phantom income." In addition, as the balance on the nonrecourse notes was paid down, interest expense deductions would be reduced, thereby further increasing income. If Rice fully recognized the phantom income generated by the transaction, his tax benefit would be limited to a deferral of tax payments.

However, as the tax court properly found, Rice most likely intended to abandon the transaction before it earned and paid any taxes on the phantom income, assuming it would have been so realized. *Rice's Toyota*, 81 T.C. at 208; *see also Estate of Franklin*, 544 F.2d at 1048 (when the taxpayer owes only nonrecourse debt and payments on the principal yield no equity due to an inflated purchase price, the taxpayer can abandon the transaction and "lose no more than a mere chance to acquire an equity in the future"). With the heavy early-stage tax deductions taken and the prospect of achieving equity in the computer slim due to the inflated purchase price paid by Rice, Rice would have every incentive to attempt to avoid reporting phantom income. Countering this, Rice points out that it might not be able to avoid

---

**4.** Finalco provided Rice with a report on residual computer values entitled *Rules of Thumb for Pricing Used Computers,* Stanford Research Institute, February 1975.

paying taxes on phantom income generated by the transaction even by abandoning or making a gift of the computer because under recent case law, termination might trigger tax recapture provisions. *See Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 1836, 75 L.Ed.2d 863 (1983). However, when Rice entered this transaction in 1976, the law was unclear regarding recapture in situations where loan balances exceed basis of property.[5] In fact, many experts were then suggesting that taxpayers could legally avoid reporting phantom income by various devices. *See, e.g.,* Ginsburg, *The Leaky Tax Shelter*, 53 Taxes 719 (1975). Bittker noted in 1978 that many tax shelter investors simply "forget" to report their gain upon abandonment. Bittker, *Tax Shelters, Nonrecourse Debt, and the Crane Case*, 33 Tax.L.Rev. 277, 277 (1978).

Hence, though the expert report certainly lends support to Rice's contention about its "profit motivation," it as certainly does not compel its acceptance in the face of at least equally strong support for the contrary inference drawn by the tax court.

Finally, Rice contends that the tax court's motivational finding against it is unsupportable because the real cause of unprofitability of this transaction was the introduction of revolutionary new products by IBM after the computer's purchase, a development unforeseeable by Rice. Although the IBM developments certainly had a disastrous impact on the used computer market, Rice had reports in its possession warning it of great instability in the used computer market. By the time Rice purchased the computer, its value had already declined to approximately 50 percent of the value of comparable new computers, and the machine was clearly lagging behind newer technology.

■ All in all, Rice's failure seriously to evaluate the likely residual value of the computer, its willingness to pay an inflated purchase price, and its use of nonrecourse debt that would facilitate abandonment of the transaction provide ample support for the tax court's finding that Rice did not have profit motivation apart from tax benefits. We cannot declare that finding clearly erroneous.

### B

■ The second prong of the sham inquiry, the economic substance inquiry, requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits. *Rice's Toyota*, 81 T.C. at 203; *see also Bridges v. Commissioner*, 325 F.2d 180, 184 (4th Cir.1963). As noted, the transaction carried no hope of earning Rice a profit unless the computer had residual value sufficient to recoup the $280,000 in principal and interest that Rice paid Finalco on the recourse note less the $10,000 net annual return to Rice under the lease agreement. Even assuming that Finalco paid Rice $10,000 annually for the full eight year term, which is by no means assured, and ignoring the time value of Rice's money invested, Rice would have to realize $200,000 in residual value to earn a profit. If Finalco re-leased or sold the computer for Rice, the more likely development in view of Rice's lack of computer marketing experience, Rice would receive only 70 percent of the proceeds and would profit only if residual value exceeded approximately $286,000.

■ The record contains estimates of residual value made by several experts that range from a low of $18,000 to a high of $375,000. Although Rice's experts presented a range of predicted residual values with a high end sufficient to earn Rice a profit, the tax court found the Commissioner's experts to be more credible and to have used more reliable forecasting tech-

---

**5.** Note 37 to *Crane v. Commissioner*, 331 U.S. 1, 14 n. 37, 67 S.Ct. 1047, 1055 n. 37, 91 L.Ed. 1301 (1947), affectionately known to tax practitioners as the most famous footnote in tax history, suggests that gain cannot be realized on the disposition of property subject to a nonrecourse mortgage greater than basis unless the taxpayer receives cash or other property. Bittker, *Tax Shelters, Nonrecourse Debt, and the Crane Case*, 33 Tax L.Rev. 277, 277 (1978).

niques. *Rice's Toyota,* 81 T.C. at 205. The tax court's finding that residual value was not sufficient to earn Rice a profit is amply supported by the record and is not clearly erroneous.[6] This finding, in conjunction with the tax court finding that Rice would not find it imprudent to walk away from the transaction, abandoning the property subject to the sale and leaseback, supports the ultimate inference drawn by the tax court that the transaction lacked economic substance. *See Hilton v. Commissioner,* 74 T.C. 305, 360–61 (1980), *aff'd per curiam,* 671 F.2d 316 (9th Cir.1982).

■ Hence, we affirm as not clearly erroneous the tax court's finding that Rice's transaction is a sham because Rice subjectively lacked a business purpose and the transaction objectively lacked economic substance.

### C

■ We turn next to the consequences of the finding of a sham. Where a transaction is properly determined to be a sham, the Commissioner is entitled to ignore the labels applied by the parties and tax the transaction according to its substance. *See Gregory v. Helvering,* 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935). We find no error in the tax court's determination that after stripping away the labels, Rice did not purchase or lease a computer, but rather, paid a fee to Finalco in exchange for tax benefits. *See Rice's Toyota,* 81 T.C. at 207 and 210.

■ Since Rice's nonrecourse debt was similarly without economic substance, it cannot be relied upon to support the claimed interest deductions. *See Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); *cf. Odend'hal v. Commissioner,* 748 F.2d 908 at 912 (4th Cir.1984) (taxpayer may not deduct interest expense on portion of nonrecourse debt that he lacks incentive to pay off). Rice was therefore not entitled to depreciation deductions based upon inclusion of the amounts representing the nonrecourse notes in its basis on the computer because Rice had not truly made an investment in the computer. *See Odend'hal,* at 912 (nonrecourse loans not representing "a real investment" in property may not be included in basis to calculate depreciation); *Estate of Franklin,* 544 F.2d at 1049. Moreover, the amount of the recourse note was also not properly includable in basis to support depreciation deductions because, as the tax court properly held, the note did not represent an investment in property. *Cf. Odend'hal,* at 912 (taxpayer not allowed to include loan in basis since loan did not represent a "real investment" in property); *Estate of Franklin,* 544 F.2d at 1049 (depreciation is predicated upon an investment in property).

■ Therefore, we affirm the tax court in its disallowance as a matter of law of depreciation deductions reflecting inclusion of the amounts of the recourse and the nonrecourse notes in basis and in its disallowance of interest deductions based on the nonrecourse loans.

### III

We disagree with the tax court, however, in its disallowance, as a matter of law, of interest deductions reflecting interest on the recourse note. The tax court denied those interest deductions because they were determined not to be based upon a genuine indebtedness. *Rice's Toyota World, Inc. v. Commissioner,* No. 16079–80, Memorandum Sur Order (T.C. Dec. 20, 1983); *see also Rice's Toyota,* 81 T.C. at 196 n. 7, 207 and 210. The tax court relied upon *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1243 (1981), to support the contention that after finding a sham, the court may disregard the entire transaction, including a cash investment. *Rice Toyota,* 81 T.C. at 196 n. 7.

*Grodt* does support the determination that depreciation deductions could not be

---

**6.** Rice contends that we should take notice of the fact that the transaction remains intact and will soon be concluded. Such evidence was not before the tax court, and we decline to consider it on appeal.

based upon the amounts of debt represented by either the recourse or nonrecourse notes, because the purchase of the depreciated property was for tax purposes a sham—a nonpurchase. Similarly, it supports the determination that the nonrecourse note did not represent "genuine debt," because of its nonrecourse nature in conjunction with the inflated purchase price in the sham purchase transaction. *See also Hilton*, 74 T.C. at 364.

But it does not follow that the sham nature of the underlying purchase transaction also supports the tax court's conclusion that the recourse note debt was not genuine. *Grodt* itself recognized that a sham transaction may contain elements whose form reflects economic substance and whose normal tax consequences may not therefore be disregarded. *Grodt*, 77 T.C. at 1243. Here the tax court, observing that principle, properly recognized the economic substance of Rice's purchase of something of economic value from Finalco, treating the "cash payment" on the recourse note as a "fee" for purchase of expected tax benefits. *Rice's Toyota*, No. 16079–80; Memorandum Sur Order; *Rice's Toyota*, 81 T.C. at 207 & 210. But the "cash payment" was merely the first installment due on the back-dated note. The other installments were equally genuine obligations notwithstanding they were deferred, and the interest due upon their payment was equally an obligation of economic substance. Rice could no more walk away without liability from the deferred principal and interest obligation than it could walk away from the obligation to pay the first installment.

For this reason, Rice's recourse note is fundamentally different from the nonrecourse notes held not to constitute genuine debt in cases such as *Hilton*, 74 T.C. at 364. Moreover, *Knetsch*, 364 U.S. at 362–65, 81 S.Ct. at 133–34, does not suggest that the debt represented by the note was not genuine because Rice did not borrow his own money to create interest expense as, in effect, did the taxpayer in *Knetsch*. *See also Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir.1966); *Bridges*, 325 F.2d at 184.

Under *Frank Lyon*, the court may not ignore transactions that have economic substance even if the motive for the transaction is to avoid taxes. *See* 435 U.S. at 583–84, 98 S.Ct. at 1303–04. Moreover, IRC § 163 does not limit deductibility of installment interest expense depending upon the item purchased by the taxpayer. Therefore, although Rice did not for tax purposes purchase property with the recourse note and may not base depreciation deductions upon it, the note nevertheless represents genuine debt upon which Rice is entitled to deduct interest expense.

IV

In summary, we affirm the tax court's factual finding of a sham transaction, its disallowance as a matter of law of depreciation deductions based upon inclusion of the nonrecourse and recourse note amounts in basis, and its disallowance as a matter of law of interest expense deductions arising out of the nonrecourse debt. We reverse its disallowance as a matter of law of deductions arising out of the recourse debt, and remand to the tax court for recalculation of Rice's deficiency and entry of an appropriate order.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.