**Cecil H. SHIRAR and Jessie May Shirar, Petitioners–Appellants,**

v.

**COMMISSIONER INTERNAL REVENUE SERVICE, Respondent–Appellee.**

No. 88–7451.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 15, 1989.

Decided Oct. 16, 1990.

As Amended Nov. 6, 1990.

Bruce I. Hochman and Avram Salkin, Hochman, Salkin, and DeRoy, Beverly Hills, Cal., for petitioners-appellants.

Kim Stanley, Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before SNEED, HUG and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

Cecil H. Shirar ("Shirar") purchased a life insurance policy to obtain liquidity in the event of his wife's death. Part of the coverage was financed with funds loaned by the insurer against the cash value of the policy. Shirar sought to deduct the interest on these loans under 26 U.S.C. § 163(a).[1] The Commissioner of Internal Revenue ("Commissioner") disallowed the deductions and assessed a deficiency. The Tax Court agreed with the Commissioner and upheld the deficiency. We reverse.

---

1. Since the years at issue antedate the Internal Revenue Code of 1986, all references to the Tax Code are to the Internal Revenue Code of 1954.

## FACTS AND PROCEEDINGS

In 1978, Shirar and his wife, Jessie May, consulted with their accountant who estimated that at the death of the first to die, the Shirars' estate tax liability would be approximately $700,000. Although the Shirars had sufficient assets to pay the estate taxes, they did not want their estates to be forced to liquidate these assets. Therefore, the Shirars decided to purchase life insurance policies to provide a ready source of cash.

In December 1978, Shirar purchased a policy from the John Adams Life Insurance Company on the life of his wife, who was then 56 years old, and designated himself as the beneficiary. The policy consisted of two components: the "Initial Face Amount" ("IFA") coverage of $500,000 and the "Ultimate Face Amount" ("UFA") coverage $2,000,000 less policy loans. At the age of 70, the IFA coverage terminated and the UFA provided the sole means of insurance protection. In the event of death prior to Mrs. Shirar's 70th birthday, the policy provided a death benefit of the IFA of $500,000 plus the net cash value of the UFA. The net cash value of the UFA equaled the cash value of the UFA minus policy loans. In the event of death after Mrs. Shirar reached age 70, UFA coverage of $2,000,000 less policy loans would be paid.

The IFA coverage required annual premiums of $13,180 for fourteen years. The total premium for the UFA was $1,044,060, payable by the time Mrs. Shirar reached age 65. Shirar chose to obtain $1,500,000 of UFA coverage when he first purchased the policy for a premium of $717,915. According to his policy outline, Shirar planned to obtain the additional $500,000 of UFA coverage for a premium of $326,145 when his wife reached age 65, thus completing payment of the total UFA premium of $1,044,060.

Shirar's premium for both components of the policy was $731,095 in 1978. Shirar paid $717,915 of the premium by borrowing

the cash value of the UFA from the insurance company, paying the balance out-of-pocket. He paid $43,075 in interest on the loan. For the second year, 1979, the premium was $13,180 and the interest was $44,583. Shirar paid the premium and interest by borrowing the increase in the cash value of the UFA, in the amount of $25,127, and paid the balance out-of-pocket. In the third year, 1980, the premium was $13,180 and interest was $45,447. Shirar again paid the premium and interest by borrowing the increase in the cash value of the UFA, and paid the balance out-of-pocket. The amount borrowed in 1980, however, did not constitute the entire increase in the cash value of the UFA for that year. According to the policy plan, Shirar did not intend to borrow from the increase in the cash value of the UFA at any time during the next four years.

During the fourth year of the policy, Congress changed the estate tax laws to provide for an unlimited marital deduction. *See* 26 U.S.C. § 2056(b) (1982). As a result, Shirar and his wife determined that they no longer required a source of cash at the time of the first to die, and surrendered the policy in January 1982. At that time, Shirar received the net cash surrender value in the amount of $11,594 from the insurance company.

Shirar claimed interest deductions of $43,075 for 1978, $44,583 for 1979, and $45,583 for 1980 under 26 U.S.C. § 163(a). The Commissioner disallowed the latter two deductions,[2] finding that no true indebtedness had been incurred. The Tax Court upheld the Commissioner's determination, finding that no valid loan existed and that the amounts deducted by the taxpayers were in fact part of the premium for the purchase of an ordinary whole life insurance policy. Shirar timely appeals.

## DISCUSSION

I. *Necessity of Economic Substance*

 Shirar contends that the Tax Court erred by concluding that the loan transac-

---

**2.** The Commissioner did not disallow the interest deduction for 1978 because it was barred

from doing so by the statute of limitations.

tions involved in his life insurance arrangement lacked economic substance. We review a Tax Court's determination whether a transaction is lacking in economic substance under the clearly erroneous standard. *Enrici v. Commissioner Service*, 813 F.2d 293, 294 (9th Cir.1987); *Thompson v. Commissioner*, 631 F.2d 642, 646 (9th Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981).[3]

■ Ordinarily, "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a) (1982). Interest on insurance policy loans is thus deductible, despite the fact that the insurance company looks solely to the cash surrender value of the policy to pay the principal and interest, and no true personal liability arises against the borrower. *Murray Kay v. Commissioner*, 44 T.C. 660, 672 (1965). It is well established, however, that to be deductible, interest must be paid on genuine indebtedness. In *Knetsch v. United States*, 364 U.S. 361, 366, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960), the Supreme Court held that when a loan transaction lacks economic substance, no true indebtedness exists, and interest on such loan is not deductible. A transaction will be determined to be lacking in economic substance, a "sham" transaction, when there is nothing of substance to be realized beyond a tax deduction. *See id.;* 6 Mertens Law of Federal Income Taxation § 26.10 (1988).

■ In *Knetsch*, the disputed transaction involved the purchase of ten single-premium, thirty-year maturity deferred annuity savings bonds, each in the face amount of $400,000 and bearing interest at a rate of 2½% compounded annually. The total purchase price was $4,000,000.

Knetsch made a $4,000 downpayment, and borrowed $4,000,000 worth of nonrecourse annuity loan notes that were secured by the annuity bonds and bore an interest rate of 3½%. In effect, Knetsch purchased $4,000,000 worth of annuities bearing interest at a rate of 2½% and concurrently borrowed $4,000,000 at an annual interest rate of 3½%. Each year, Knetsch paid his interest of 3½% on the outstanding loan balance while borrowing the increased cash value of the annuity bonds. As a result, Knetsch paid the insurance company $294,-570 in interest during the two taxable years involved and received $203,000 in loans, an out-of-pocket difference of $91,-570. At the same time, Knetsch's equity in the annuity bonds, the excess of the cash value of the bonds over the escalating debt, remained at the nominal sum of $1,000. The Court found that since the only return on his out-of-pocket costs of $91,570 was the "relative pittance" of $1,000, Knetsch's financial arrangement with the insurance company "did not appreciably affect his beneficial interest except to reduce his tax." *Knetsch*, 364 U.S. at 366, 81 S.Ct. at 135 (quotation omitted). Therefore, the Court determined that there was "nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction." *Id.* The loan transactions were held to be shams, and the interest deductions disallowed.[4]

Relying on *Knetsch*, the Tax Court held that the loan transactions involved in Shirar's life insurance arrangement lacked economic substance. The court determined that Shirar had in fact purchased a typical ordinary life or whole life policy in the face amount of $500,000, and then superimposed upon this whole life policy the UFA. Not-

---

3. Although we have noted that the determination of whether a transaction is lacking in economic substance is "perhaps a mixed issue of law and fact," *Enrici*, 813 F.2d at 294, we review the Tax Court's determination under the clearly erroneous standard "because it 'is essentially a factual determination.'" *Id.* (quoting *Thompson*, 631 F.2d at 646).

4. We followed *Knetsch* in *Pierce v. Commissioner*, 311 F.2d 894 (9th Cir.1962). In *Pierce*, the taxpayers had purchased long-term deferred an-

nuity contracts from an insurance company and promptly borrowed back their cash value. As a result, the net cash values of the contracts only increased at a nominal level. Relying on *Knetsch*, we held that because the taxpayers out-of-pocket costs were higher than the increase in the contracts' cash values, the transaction did not appreciably benefit the taxpayer's beneficial interest except to reduce his tax. We therefore affirmed the disallowance of the interest deductions claimed by the taxpayer.

ing that the premiums for the UFA were paid by borrowing its cash value, the court determined that any additional coverage provided by the UFA was almost entirely nullified by the amount of these outstanding loans. As a result, the court held that the sole purpose for the transactions was an attempt to convert part of what would have been a normal premium for a $500,000 policy to interest deductible on Shirar's income tax return.

Shirar contends that the loan transactions did possess economic substance by providing him with increased insurance coverage. We agree. Our review of the insurance plan purchased by Shirar convinces us that it possessed economic substance and was not entered into solely in order to reduce his tax.

Shirar's estate tax liability was estimated to be approximately $700,000. The IFA component of the life insurance policy provided $500,000 of coverage up to age 70. The UFA provided additional coverage up to age 70, progressively increasing to an eventual sum of $208,138. Thus, the two components of the policy provided Shirar with coverage on his wife's life that ranged from $500,000 at the policy's inception to $708,138 when she reached age 70. After Mrs. Shirar reached 70, the UFA alone provided insurance coverage on her life, equalling the face amount of coverage minus policy loans. According to Shirar's plan of purchase, the face amount of $2,000,000 reduced by loans of $1,288,908 would result in coverage in the amount of $711,092.

As such, the insurance policy purchased by Shirar is distinguishable from *Knetsch*. In *Knetsch*, the entire increased cash value of the annuity bonds save $1,000 was borrowed annually. This resulted in a maximum net cash value of $1,000 at all times, which did not justify out-of-pocket costs of $91,570. In contrast, Shirar's purchase of the UFA provided him with significant life insurance coverage both additional to and independent of the IFA, without proof of

future insurability. Unlike the situation in *Knetsch*, Shirar did not plan to borrow the entire increased cash value of the UFA on an annual basis. As a result, the net death benefit available would have progressively increased over the course of the policy, providing him with additional coverage eventually totalling $208,138 as his wife reached age 70. Furthermore, after she reached age 70, the UFA independently would have provided Shirar with insurance protection totalling $711,092. By no stretch of the imagination can this increased insurance protection be considered a "relative pittance." The UFA provided Shirar with a substantial return for his out-of-pocket costs, a return absent in *Knetsch*.[5]

Additionally, we note that absent the increased insurance coverage provided by the UFA, Shirar would not have had sufficient liquidity to meet the estate tax obligations upon the death of his wife. Shirar's estate tax liability was estimated to be approximately $700,000. The IFA only provided $500,000 of coverage on the life of Shirar's wife up to age 70, and did not provide coverage after she reached that age. Purchase of the UFA therefore not only increased the coverage on Shirar's wife before age 70, but also provided the sole means of coverage after she reached that age. Not coincidentally, this increased coverage ultimately provided Shirar with overall insurance protection slightly in excess of $700,000, precisely the amount needed to meet his estate tax obligations.

In any event, even if the Commissioner had allowed the interest deductions claimed for 1979 and 1980, Shirar would have still had a net out-of-pocket expense. Similarly, if the policy had been taken to term and all interest deductions allowed, Shirar would have sustained a net out-of-pocket expense. In contrast, allowance of the interest deductions involved in *Knetsch* would have resulted in a net gain for the taxpayer. We thus cannot agree with the Commissioner's argument that Shirar entered into

---

**5.** For this reason, we reject the Commissioner's argument that because the cash value of Shirar's policy did not increase at a greater rate than the rate of interest charged on the loan involved, the transaction *per se* lacked economic substance.

the loan transactions solely in order to reduce his tax.

Finally, we reject the Commissioner's argument that even if Shirar's insurance policy possessed economic substance, the underlying loan transactions were shams. The Commissioner cites to *Golsen v. Commissioner*, 445 F.2d 985 (10th Cir.1971), and *Ballagh v. Commissioner*, 331 F.2d 874 (2d Cir.), *cert. denied*, 379 U.S. 887, 85 S.Ct. 157, 13 L.Ed.2d 92 (1964), in support of this proposition. In these cases, it was held that a loan transaction could be lacking in economic substance by not appreciably affecting the taxpayer's beneficial interest except to reduce their tax despite the fact that the insurance coverage on which the loan was superimposed had some value. *See Golsen*, 445 F.2d at 989; *Ballagh*, 331 F.2d at 878. We find these cases inapposite. The loan transactions undertaken by Shirar allowed him to increase the amount of insurance protection available on the life of his wife, thereby measurably appreciating his beneficial interest. We thus reject the Commissioner's assertion that independent of insurance coverage, the loan transactions entered into by Shirar were shams.

Accordingly, we hold that the loan transactions involved had economic substance. Purchase of the UFA benefited Shirar's beneficial interest by providing him with sufficient insurance coverage to meet his estate tax obligations upon the death of his wife.[6]

## II. *Section 264 Issues*

Because the Tax Court found that Shirar's loan transactions lacked economic substance, it did not reach the question of whether Shirar's interest deductions are allowable under 26 U.S.C. § 264. As we have held that the transactions did possess economic substance, we must reach these questions.

Although 26 U.S.C. § 163(a) generally allows deductions for all interest paid or accrued within a taxable year on indebtedness, section 264 of the Tax Code prohibits deductions if either the interest paid was pursuant to a plan of purchase contemplating "the systematic direct or indirect borrowing of part of all the increases in the cash value of such contract," *see* 26 U.S.C. § 264(a)(3) (1982); or the interest paid or accrued was pursuant to a single premium life insurance policy, *id.* § 264(a)(2). The Commissioner contends that under either provision, the interest deductions claimed by Shirar are prohibited.

### A. Systematic Borrowing Exception

■ Shirar acknowledges that his insurance plan contemplated the systematic borrowing of part of all the increase in the cash value of the policy, prohibited by section 264(a)(3), but argues that the interest deductions are allowable because the plan falls under a safe harbor to the statute. Section 264(c) of the Tax Code provides that the systematic borrowing exception does not prohibit interest deductions where "no part of 4 annual premiums due during the 7–year period (beginning with the date the first premium on the contract to which such plan relates was paid) is paid under such plan by means of indebtedness." *Id.* § 264(c). An analysis of Shirar's policy reveals that it was designed to fall within this safe harbor, as Shirar planned to borrow for the first three years of the policy but not at all during the following four years.

The Commissioner contends that the safe harbor is only available when a taxpayer has completed the full seven years contemplated by the statute. The Commissioner suggests that the plain language of section 264(c), setting forth that "no part of 4 annual premiums ... *is paid*" during a seven-year period, dictates this conclusion by clearly referring to something that has been accomplished, not something that is planned or will prospectively occur in the future. Noting that Shirar terminated his

---

6. Our conclusion is bolstered when we consider Shirar's actions once the estate tax laws were changed by Congress in 1981. Shirar terminated the policy because he no longer needed a ready source of cash in the event of his wife's death. If Shirar had in fact purchased the UFA coverage solely to reduce his tax, he presumably would have maintained the policy despite the change in the law so as to continue benefiting from the tax savings. He did not do so.

policy after only three years because of the change in the estate tax laws, the Commissioner asserts that the safe harbor does not apply because the policy was not in fact carried out for the full seven years.

We disagree. Although we agree with the Commissioner in principle that a taxpayer normally cannot avail themself of the safe harbor without in fact completing the relevant seven-year period, we hold that in cases such as Shirar's in which the taxpayer does not complete this period by reason of a change in the tax laws, the seven-year requirement should not be imposed. Shirar purchased the life insurance policy in 1978 to meet his estimated estate tax obligations in the event of his wife's death. Following closely the safe harbor exception to section 264(a)(3), Shirar's insurance plan did not anticipate the borrowing of any funds on the cash value of the policy for four of its first seven years. The Commissioner does not dispute that if Shirar had retained the policy for the full seven years, the safe harbor exception would be available to him. In 1981, Congress changed the estate tax laws so as to provide an unlimited marital deduction, whereupon Shirar promptly surrendered the policy because he no longer needed a ready source of liquidity upon his wife's death. To deny Shirar the benefit of the safe harbor would be to punish him for following a prudent course of tax planning that based the calculation upon the change in the tax law adopted by Congress. This we will not do. Accordingly, we hold that the interest deductions claimed by Shirar are allowable under the safe harbor to section 264(a)(3).

■ In the alternative, the Commissioner suggests that the Treasury Regulations preclude Shirar from fitting under the safe harbor. The Commissioner notes that Regulation 1.264-4 directs any borrowings in excess of the premium due for one year to be assigned to the premium for the previous year. See 26 C.F.R. § 1.264-4(d)(1)(i). Because Shirar planned to borrow in excess of the premium due on the eighth year, the

Commissioner argues the excess should be attributable to the seventh year. Shirar's haven under the safe harbor would thereby be disallowed as he no longer would have paid no part of four annual premiums due during the seven-year period by means of indebtedness.

We reject this argument. Regulation 1.264-4(d))(1)(ii) makes clear that the rule permitting the allocation of excess borrowings to previous years (and in some cases, subsequent years) applies only to borrowings incurred during the applicable seven-year period. Shirar's borrowings under the eighth year cannot, therefore, be assigned to the seventh year under the authority of the Regulations.[7]

## B. Single Premium Insurance Exception

■ A single premium insurance contract is defined as one where "substantially all the premiums on the contract are paid within a period of four years from the date on which the contract is purchased." Id. § 263(b)(1). Neither the statute nor its legislative history indicates precisely what was meant when Congress used the phrase "substantially all." Some guidance, however, is provided by the case of Dudderar v. Commissioner, 44 T.C. 632 (1965). In Dudderar, it was held that 73% of the premiums paid on an insurance policy did not constitute payment of substantially all of the premiums on the policy. Id. at 638. The Commissioner subsequently acquiesced in this decision. See 1966-2 C.B. 4 (1966).

The Commissioner contends that the UFA is a single premium insurance contract because Shirar paid 100% of its premiums within four years of its purchase. The Commissioner notes that Shirar paid the $717,915 premium on $1,500,000 of UFA coverage in 1978 when he purchased the policy, and surrendered the policy in 1982 without purchasing additional coverage. Therefore, the Commissioner argues that the interest deductions are not allowable. Shirar concedes that the premium payment

---

7. Nor can the allocation of excess borrowings to subsequent years be applied to Shirar. A forward allocation of this sort is only permitted when the allocation to previous years has been

exhausted. Under Shirar's policy plan, the excess borrowings for 1979 and 1980 would both be allocated to 1978, leaving nothing to carry forward.

for the initial UFA coverage was paid in full within the applicable four years, but alleges that this payment did not constitute "substantially all" of the total anticipated premiums on the policy. Arguing that the UFA and IFA are not divisible, Shirar asserts that in fact the amount payable during the first four years was $770,635, constituting the UFA premium of $717,915 plus four annual IFA premiums of $13,180, while the total projected premiums on the policy amounted to $1,228,580. Therefore, Shirar contends that the premium payments paid within the first four years of the policy only represented 62.7% of the total premium payments due on the policy, well under the 73% figure adjudged in *Dudderar* not to fall within the statutory definition of "substantially all."

We agree with Shirar. The Commissioner's calculation attempts to treat the IFA and UFA as separate and distinct insurance policies rather than two components of the same policy. Such a division is inconsistent with the policy's structure. Shirar purchased *one* insurance policy that consisted of two components. These two policy components worked in tandem to provide Shirar with sufficient insurance protection on the life of his wife to meet his estate tax obligations. Absent the UFA, Shirar would not have had any insurance coverage after his wife reached age 70; absent the IFA, the coverage provided before she reached that age would not be nearly enough to meet these obligations. As such, the IFA and UFA are separate *components* of the policy, they are not and cannot be treated as distinct and separate insurance *policies*.

Furthermore, the Commissioner's calculation omits consideration of the expected premium of $326,145 that Shirar was to have paid for additional UFA coverage of $500,000 when his wife turned 65. Implicitly, the Commissioner is arguing that premiums not actually undertaken should not factor into a section 264(a)(1) determination. As discussed above, this approach punishes Shirar for planning according to the tax laws then on the books in determining estate tax needs. There is nothing in the record to indicate that Shirar would not have purchased the additional $500,000 of coverage had Congress not changed the estate tax laws in 1981. In fact, it was necessary for Shirar to make this purchase in order to meet the estimated estate tax obligations. Consideration of the expected $326,145 premium thus is a necessary element to a section 264(a)(2) calculation.

Accordingly we find that only 62.7% of the total premiums due on the policy were paid within the first four years. Hence, we do not find the policy purchased by Shirar to be a single premium insurance contract.

## CONCLUSION

We allow the interest deductions claimed by Shirar for the years 1979 and 1980. The judgment of the Tax Court is REVERSED.