In re CM HOLDINGS, INC., Camelot Music, Inc., G.M.G. Advertising, and Grapevine Records and Tape, Inc., Debtors.

INTERNAL REVENUE SERVICE, Petitioner,

v.

CM HOLDINGS, INC., Respondent.

Civ.A. No. 97–695 MMS.

United States District Court, D. Delaware.

May 29, 1998.

Gregory M. Sleet, United States Attorney, Ellen W. Slights, Assistant United States Attorney, U.S. Department of Justice, Wilmington, DE; of Counsel: Dennis M. Donohue, Alan J.J. Swirski, and Joseph A. Sergi, U.S. Department of Justice, Washington, DC, for Petitioner.

S. David Peress, of Young, Conway, Stargatt & Taylor, L.L.P., Wilmington, DE; of Counsel: Owen C. Pell, Howard S. Beltzer, and Kirk E. Sheriff, of White & Case, New York City, for Respondent.

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### I. Introduction

CM Holdings, Inc., Camelot Music, Inc., G.M.G. Advertising, Inc. and Grapevine Records and Tapes, Inc. (collectively "Camelot") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code ("Chapter 11") with the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court").[1] Under 28 U.S.C. § 157(a)[2],

---

1. The Debtors' joint plan of reorganization was confirmed over objection of the Internal Revenue Service ("IRS") on December 12, 1997.

2. 28 U.S.C. § 157(a) reads:

Each district may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a

the Bankruptcy Court may hear proceedings arising under Chapter 11 upon reference of the district court. As Camelot's petition was filed in August of 1996, this bankruptcy proceeding was referred to the bankruptcy court by virtue of a Standing Order of Reference, which referred all bankruptcy matters directly to the Bankruptcy Court.[3]

During the pendency of the bankruptcy proceeding, the Internal Revenue Service ("IRS") filed proofs of claim against Camelot based upon its assertion that tax deductions on interest claimed by Camelot for its Corporate–Owned Life Insurance ("COLI") plan were disallowable under Internal Revenue Code ("I.R.C.") (26 U.S.C.) §§ 163(a) and 264(c)(1).[4] Camelot filed a Limited Objection to the IRS' proofs of claim disputing the IRS' assertions, thereby converting the IRS' claim into a contested matter under 11 U.S.C. Bankruptcy Rule ("Bankr.Rule") 3007.[5] The IRS responded to Camelot's Objection by filing in this Court a motion under 28 U.S.C. § 157(d)[6] for mandatory withdrawal of the reference to the Bankruptcy Court.[7]

Jurisdiction is proper under 28 U.S.C. §§ 1334 and Bankr.Rule 5011(a)[8]. *See Hatzel & Buehler, Inc., v. Central Hudson Gas & Electric Corporation,* 106 B.R. 367, 368 (D.Del.1989). For the reasons which follow, the Court will withdraw this contested matter from the reference of the Bankruptcy Court.

## II. Factual Background

Beginning in 1990, Camelot established a COLI plan to provide funding for future liabilities in connection with its self-insured employee benefit plans. Under this COLI plan, Camelot purchased individual, whole life insurance policies on the lives of approximately 1,400 of its employees and officers.[9] Camelot is the sole owner and beneficiary of these policies.[10] To the extent Camelot used loans to pay premiums due on the policies, Camelot deducted the interest payments on an accrual basis for the appropriate periods on its federal income tax returns.

The IRS contends that this COLI plan which Camelot operates is a "no pay" COLI plan. Under a "no pay" COLI, over the projected life of the plan, the policyholder does not part with any of its own funds to pay the premium and interest due under the policies. Instead, premium and interest payment are funded mainly by loans taken against stated policy value, which value was

---

case under title 11 shall be referred to the bankruptcy judges for the district.

**3.** On January 23, 1997, the Court withdrew this Standing Order of Reference effective for cases filed on, or after, February 3, 1997.

**4.** In 1996, Congress passed a law, currently being phased in and completely effective on January 1, 1999, disallowing interest deductions on loans with respect to Company–Owned Insurance. *See* I.R.C. § 264(d). That being said, this new law does not apply to COLI plans, like Camelot's, in existence before 1996. *See id.*

**5.** Bankruptcy Rule 3007 states:

An objection to the allowance of a claim shall be in writing and filed. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession and the trustee at least 30 days prior to the hearing. If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding.

Although Camelot's objection to the IRS' claim is not joined with a demand for relief, and therefore does not constitute an adversary proceeding, the Advisory Committee note to this Rule identifies an objection to a claim, not joined to a demand for relief, as a contested matter governed by Rule 9014. *See* Bankr.Rule 3007, Adv. Comm. Note.

**6.** *See infra* p. 720.

**7.** Additionally, the IRS filed both a motion in Bankruptcy Court for a stay of proceedings relative to this objection pending a determination by this Court of the IRS motion, and amended proofs of claim for close to nine million dollars. The parties later stipulated to a stay of the bankruptcy court proceedings, pending a determination of this motion.

**8.** Bankr.Rule 5011(a) states: "A motion for withdrawal of a case or proceeding shall be heard by a district judge."

**9.** The face value of these individual insurance policies varied inversely with the age of the covered employee, e.g., the younger the employee, the higher the face value of the insurance policy.

**10.** As a result, if an employee should die while covered by this COLI plan, the death benefits go to Camelot, not to the employee. Camelot maintains the death benefit proceeds are then employed to support its employee benefit plans.

created in the first instance by the premium themselves. As time goes on, premium and interest charges are discharged principally through a combination of policy-generated "dividends" and "surrenders" of policy value, which value is largely created by premiums "paid" previously by borrowed funds. Corporations which employ "no pay" COLI plans typically derive an overall positive cash flow as a result of the tax benefit which accrues from interest deductions on policy loans. In the end, the policyholder pays nothing for the insurance through a circular flow of internally-generated policy funds to pay premiums.

The IRS asserts "no-pay" COLI plans represent another attempt by life insurance companies and American corporations to circumvent the restrictions placed by Congress on the deductibility of interest on loans taken out in connection with life insurance policies. Because the IRS believes this practice is widespread in corporate America, the IRS maintains the outcome of this case will have a large impact on the United States Treasury, as the total interest on loans taken out in connection with COLI plans is in excess of two billion dollars. However, if these interest payments on loans are found to be non-tax deductible, the COLI will lose its tax-saving benefits and may completely cease to exist.[11]

In the present case, Camelot has claimed tax deductions for interest payments it made in connection with its COLI program from 1991 to 1993. Camelot argues the non-recourse insurance policy loans at issue constitute genuine indebtedness under I.R.C. § 163(a)[12]. Additionally, Camelot asserts it comes under the safe harbor provisions of I.R.C. § 264(c)(1)[13] which allows interest deductions on amounts systematically borrowed from insurance policy values to finance the payment of life insurance premiums if certain conditions are met. Lastly, Camelot contends the tax consequences arising from the

COLI plan are well settled and firmly established by a large body of case law.

The IRS, on the other hand, does not believe this case involves the routine application of the Tax Code's provisions to a non-recourse insurance policy loan. Instead, the IRS submits that Camelot's COLI is little more than a tax-motivated, zero-value investment shell that does not support Camelot's claim to interest deductions under I.R.C. §§ 163(a). In addition, the IRS contends Camelot's COLI does not satisfy the safe-harbor provisions of I.R.C. § 264(c)(1) because the relationship between debt to premiums under the COLI fails to satisfy the criteria enunciated in that statute. The IRS therefore argues Camelot wrongly claimed tax deductions on interest to which it had no right and now owes the IRS back interest and penalties of approximately nine million dollars.

### III. Discussion

At this stage of the proceedings, the sole issue is whether this contested matter between Camelot and the IRS should be decided by this Court or the Bankruptcy Court. However, before the court addresses the substance of the IRS' mandatory withdrawal motion, Camelot has raised two procedural barriers to consideration of this motion.[14] Namely, Camelot asserts: 1) the IRS did not respond to its objection in an appropriate fashion and 2) the present motion for withdrawal of the reference was filed in an untimely manner. The Court considers each of these contentions in turn.

### A. Procedural Contentions

#### 1. The IRS' Response to Camelot's Objection

■ The first procedural issue raised by Camelot is whether the IRS properly responded to its objection. Camelot contends that although it filed an objection on October

---

11. Of course, COLI plans may completely cease to exist on their own given the recent passage of I.R.C. § 264(d). *See infra* n. 4.

12. *See infra* p. 722.

13. *See infra* pp. 722–23.

14. Although the IRS previously disputed whether it was properly served under the Bankruptcy Code with Camelot's objection to its proofs of claim, at oral argument the IRS advised the Court it would no longer pursue this procedural issue.

15, 1997, and the deadline for responses was November 24, 1997, the IRS never responded. Instead, the IRS on October 27, 1997, filed amended proofs of claim against Camelot in the Bankruptcy Court, and on November 21, 1997, filed in this Court the present motion to withdrawal the reference to the Bankruptcy Court.[15] Camelot believes this course of action by the IRS did not constitute a sufficient response and therefore argues that its objection to the IRS' proofs of claim must be granted by the Bankruptcy Court.

The IRS, on the other hand, believes its motion to stay, which incorporated by reference this motion for withdrawal, should be sufficient to satisfy any response requirement on its part, as it fully set out in those motions a detailed recitation of its opposition to Camelot's objection. The IRS argues that although not technically labeled a "response," this course of action should have adequately notified Camelot of the IRS' reasons for disagreeing with Camelot's objection. Lastly, the IRS observes that to allow the Bankruptcy Court to grant Camelot's objection at this point would be equivalent to entering a default judgment under Fed.R.Civ.P. 55(e), which is not allowed against the United States "unless the claimant establishes a claim or right to relief by evidence satisfactory to the court."

Under Bankr.Rule 9014, which applies to the filing of motions in "contested matters" such as this one, "[n]o response is required ... unless the court orders an answer to a motion." Camelot has been unable to point to any evidence in the record that the Bankruptcy Court entered such an order.[16] Absent a court order, standing order, or local rule which required the IRS to file a response to Camelot's objection, one is hard pressed to find the requisite authority which would permit the Bankruptcy Court to enter judgment on behalf of Camelot.

That being said, even if Camelot were to establish the IRS was required to file such a response, the Court holds the IRS has given adequate notice to Camelot of its opposition to their objection. In *Beard v. U.S. Trustee,* 188 B.R. 220 (W.D.La.1995), the district court found that although the claimant did not file a formal response, the given response was sufficient because what the claimant "did file ... undoubtedly informed the debtor and the court of the arguments and evidence it planned to present with respect to the issues raised by the debtor's Objections ...." *See id.* at 223. Hence, the district court found that what the claimant did file served as a functional equivalent to a separate written response. *See id.* Similarly, in the present case, although the IRS did not file a separate written response to Camelot's objection in Bankruptcy Court, the Court finds that filing this motion to withdraw the reference put Camelot on notice regarding the IRS' opposition to its objection. What the IRS did file undoubtedly informed Camelot and the Bankruptcy Court of the arguments and evidence the IRS planned to present with respect to the issues raised by Camelot's objection. Further, the IRS amended detailed proof of claim and motion to withdraw the reference were filed on November 21, 1997, three days before the putative answering deadline was to expire. The Court holds the IRS properly responded to Camelot's objection.

### 2. Timeliness of the IRS' Withdrawal Motion

The second procedural issue is whether the motion to withdraw is untimely and should consequently be denied. Specifically, Camelot argues the IRS had an obligation to seek withdrawal of the reference upon, or promptly after, filing its proofs of claim in January of 1997. Because the IRS waited to file the withdrawal motion until November of 1997, Camelot contends the IRS' motion should be denied as untimely. The IRS responds by asserting that under the Bankruptcy Code it

---

15. On November 21, 1997, the IRS also filed in the Bankruptcy Court a motion to stay the Bankruptcy Court proceedings relative to Camelot's objection, pending a determination by this Court of the withdrawal motion. As discussed above, such a stay was subsequently consented to by the parties.

16. Although Camelot asserts the response deadline date was set by the clerk of the Bankruptcy Court, there is no evidence in the record that the clerk's actions were ordered by the Bankruptcy court.

was not required to move to withdraw the reference until an objection to the claim was actually filed. Further, the IRS points out that if required to move to withdraw its claim before a debtor filed its objection, it would be mere guesswork to determine which debtors would actually maintain a challenge to the IRS claim and would needlessly overcrowd the district court dockets with these types of withdrawal motions.

The relevant statutory language for "mandatory withdrawal" is the second sentence of 28 U.S.C. § 157(d) [17]:

> The district court shall, on timely motion of a party, so withdraw a *proceeding* if the court determines that resolution of the proceeding requires consideration of both Title 11 and other laws of the U.S. regulating organizations or activities affecting interstate commerce. (emphasis added).

Importantly, the statutory language requires, as a threshold matter, that there be a "proceeding," i.e., a contested matter between debtor and a claimant, in the bankruptcy court to be withdrawn. *See In re Nibsco Supply, Inc.*, 1997 WL 311458 at *1 (W.D.N.Y. June 5, 1997) (citing *In re E & S Facilities, Inc.*, 181 B.R. 369, 371 (S.D.Ind. 1995), *aff'd sub nom. Matter of Vicars Ins. Agency Inc.*, 96 F.3d 949 (7th Cir.1996)). "Unless objected to, a claim which is the subject of a properly filed proofs of claim is deemed allowed," and no proceeding is initiated. *In re Chateaugay Corp.*, 104 B.R. 622,

624 (S.D.N.Y.1989). However, "[s]hould the debtor ... file an Objection to a claim, a contested matter is initiated ...." *Id.* Consequently, "[t]he filing of a proof of claim does not initiate either an adversary proceeding or a contested matter. Rather, when an Objection to a proof of claim is filed, the Objection initiates a contested matter." *In re Fairchild*, 969 F.2d 866, 868 (10th Cir. 1992).[18]

 Timeliness of a motion to withdraw a reference is governed from the point of time when Camelot filed its objection, not when the IRS first filed its proofs of claim. Camelot filed its objection to the IRS' proofs of claim on October 15, 1997. The IRS filed their withdrawal motion on November 21, 1997, slightly more than five weeks from the time Camelot filed its objection. The Court holds this wait was not impermissibly long and therefore, the IRS' motion was timely made. *See In re Oil Co., Inc.*, 140 B.R. 30, 33 (E.D.N.Y.1992) (finding that motion for withdrawal of reference made six weeks from time debtor filed its Objection was timely filed for purposes of 28 U.S.C. § 157(d)).[19] As argued by the IRS, any other rule would invariably lead to the overcrowding of district court dockets with unnecessary motions to withdraw references.

## B. Mandatory Withdrawal of the Reference

With the IRS having surmounted procedural barriers, attention is now turned to the

**17.** Under the first sentence of 28 U.S.C. § 157(d): "The district court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown ...." (emphasis added). However, this statutory language refers to a second type of withdrawal procedure known as "permissive withdrawal." *See In the Matter of Delaware & Hudson Railway Co.*, 122 B.R. 887, 892 (D.Del.1991). Permissive withdrawal is not asserted by the IRS in this case.

**18.** Camelot's reliance on *In re Baldwin–United Corp.*, 57 B.R. 751, 754 (S.D.Ohio 1985), is misplaced. *Baldwin–United* found a claimant must file their withdrawal motion at the same time they file their proofs of claim in order to avoid a timeliness challenge. However, in *Chateaugay*, 104 B.R. at 624 n. 1, the district court for the Southern District of New York rejected the Trustees' argument that *Baldwin–United* controlled

the disposition of its case. Instead, the *Chateaugay* Court observed that in *Baldwin–United* there had been prior litigation between the parties both in a district court and in the bankruptcy court with respect to the very same liabilities asserted in the proofs of claim. *See id.* Based on these factual circumstances, the *Baldwin–United* Court found the subject matter sought to be withdrawn had been previously raised and therefore the withdrawal had not been filed at the first reasonable opportunity. *See id.* There is no such history in the instant case.

**19.** The Court notes in passing that if Camelot was prejudiced by the IRS filing its motion right on the heels of the Debtors' plan confirmation hearing, Camelot has no one to blame but itself. Camelot waited nine months after the IRS filed its proofs of claim to file its objection to the claim. Nothing precluded Camelot from filing an objection at an earlier date.

merits of the IRS mandatory withdrawal motion. Camelot argues that in order to decide the tax issues implicated by the facts of this case, all that is needed is a straightforward application of federal law. The law is not in dispute, Camelot asserts, only the facts. Further, Camelot points to Section 505 of the Bankruptcy Code, 11 U.S.C. § 505(a)(1), as permitting bankruptcy courts to apply tax law to determine a debtor's obligation to the IRS. As a result, Camelot asserts the IRS motion for withdrawal of the reference should be denied.

■ The IRS, on the other hand, contends its claims involve two complicated legal questions dealing with the applicability of I.R.C. §§ 163(a) and 264(c)(1) to Camelot's COLI plan. Because the IRS believes there is a conflict among the circuits as to what legal standard properly applies in cases such as this and such a determination is a matter of first impression as applied to COLI plans, the IRS argues the reference should be withdrawn from the Bankruptcy Court so that the proceeding can be decided by a court relatively more qualified to consider complicated questions of federal tax law. *See In re Smith Corona Corp.*, 205 B.R. 712, 714 (D.Del.1996) ("Application of this standard furthers the underlying policy of Section 157(d), which is to withdraw 'matters requiring the application of non-bankruptcy law from the relatively less experienced bankruptcy court.'") (quoting in part *In re St. Mary Hospital*, 115 B.R. 495, 497 (E.D.Pa. 1990)). As the party seeking withdrawal of the reference, the IRS bears the burden of establishing withdrawal is appropriate under these circumstances. *See In re Homeland Stores, Inc.*, 204 B.R. 427, 430 (D.Del.1997) (citing *In re Continental Airlines*, 138 B.R. 442, 445 (D.Del.1992)).

■ Mandatory withdrawal must occur when (1) consideration of federal law outside of the Bankruptcy Code is necessary to resolve the case or proceeding, and (2) such consideration of federal law outside the Bankruptcy Code is "substantial and material." *Id.*; 1 *Collier's on Bankruptcy* ¶ 3.04[2] at 3–65. In further delineating the meaning of the second prong of test, this Court has clarified the meaning of "substantial and material" by "distinguish[ing] between meaningful consideration" of federal law outside of the Bankruptcy Code and its "simple application"; when only a "simple application of well-settled law is required, withdrawal is not mandatory." *Id.* (citing *In re Columbia Gas System, Inc.*, 134 B.R. 808, 811 (D.Del.1991)); *Smith Corona*, 205 B.R. at 714. This distinction furthers the policy of narrowing the scope of 28 U.S.C. § 157(d) in order to prevent the establishment of an "escape hatch" through which most bankruptcy matters could routinely be removed to the district court. *See Smith Corona*, 205 B.R. at 714.

■ The first prong of the withdrawal test is easily met, as all that is required is a necessary consideration of federal law outside the Bankruptcy Code to resolve the proceeding. It cannot be gainsaid that the federal Tax Code must be consulted in order to determine the validity of the IRS' claims and federal tax law regulates organizations or activities affecting interstate commerce, as required under 28 U.S.C. § 157(d). However, under the second prong of this mandatory withdrawal test, the consideration of federal law must be "substantial and material," such that there is a "meaningful consideration" of the federal law and not just a straightforward "simple application" of federal law to the facts of the case.[20] Potential tax legal issues are: (1) whether Camelot was entitled under I.R.C. § 163(a) to take deductions for the interest incurred on loans taken under

---

**20.** Based on *dicta* found in *In re Continental Airlines*, 138 B.R. 442 (D.Del.1992), Camelot argues that in order for a reference to be withdrawn, the federal nonbankruptcy law in dispute must also be either one of first impression or in sharp conflict with competing provisions of the Bankruptcy Code. *Id.* at 447. Without passing on the validity of this argument, the Court only notes the IRS meets the applicable criteria either under the "substantial and material consideration" test expressly advanced in this and other districts or the more stringent standard enunciated in *dicta* in *Continental Airlines*, which includes the "first impression" and "sharply in conflict" tests. The IRS has satisfied the criteria of both tests by establishing the tax issues in dispute are both unsettled, thereby necessitating substantial and material consideration, and of first impression.

the COLI Policies; and (2) whether Camelot's interest deductions qualify for "safe harbor" treatment under the test set out in I.R.C. § 264(c)(1). The Court considers each potential tax issue seriatim, but at this time procedural stage avoids a discussion of the merits.

### 1. Deductibility of Interest Under I.R.C. § 163

Under I.R.C. § 163(a), "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Camelot asserts hornbook law establishes that for interest to be deductible under Section 163(a), the underlying transaction must be a true loan rather than a sham transaction aimed solely at tax avoidance. *See United States v. Wexler,* 31 F.3d 117, 122 (3d Cir.1994), *cert. denied,* 513 U.S. 1190, 115 S.Ct. 1251, 131 L.Ed.2d 133 (1995). Further, Camelot states the well-established principle that a transaction will not be regarded as a sham merely because it was entered in part for tax-savings motives, so long as it has economic substance and a legitimate business purpose. *See id.* (citing *Knetsch v. United States,* 364 U.S. 361, 365–66, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960)). The Court does not disagree with Camelot's recitation of the applicable law up to this point.

However, Camelot in its next argument takes a sizable leap of faith: it argues that it is clear and evident that its COLI plan, and the loans taken thereunder, were established for a legitimate business purpose and that these transactions had economic substance. To back up this assertion, Camelot makes reference to four cases: *Woodson–Tenent Laboratories, Inc. v. United States,* 454 F.2d 637 (6th Cir.1972); *Campbell v. Cen–Tex, Inc.,* 377 F.2d 688 (5th Cir.1967); *Coors v. United States,* 215 Ct.Cl. 840, 572 F.2d 826 (1978); and *Shirar v. Commissioner,* 916 F.2d 1414 (9th Cir.1990). These cases all stand for the proposition that non-recourse insurance policy loans can constitute genuine indebtedness, and interest paid on such loans

is properly deductible under I.R.C. § 163(a), as long as there is a legitimate business purpose for acquiring, and economic substance to, the underlying insurance.

Be that as it may, there are two cases and a recent Technical Advice Memorandum from the IRS that take another view on this matter: *Golsen v. Commissioner,* 445 F.2d 985 (10th Cir.1971), *cert. denied,* 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971); *Ballagh v. United States,* 166 Ct.Cl. 191, 331 F.2d 874 (1964), *cert. denied,* 379 U.S. 887, 85 S.Ct. 157, 13 L.Ed.2d 92 (1964); and Technical Advice Memorandum, 1998 WL 123675 at 18–19 (I.R.S. March 20, 1998). These cases and Technical Advice Memorandum not only focus on whether the underlying insurance policy has economic substance, but also examine the financing arrangements of the insurance policies to see whether the underlying loan transactions were shams without economic substance. Hence, two separate legal standards have been established to determine whether these life insurance policy loans have economic substance and the Third Circuit Court of Appeals has yet to weigh in on this debate.

It necessarily follows this area of the law is unsettled as to which of these two legal standards should apply. Further, it is undeniable that this case presents an issue of first impression in this circuit. Additionally, Camelot does not, and cannot, dispute that there is only an IRS ruling, and no federal case law,[21] on the applicability of I.R.C. § 163(a) to these newly-fashioned COLI insurance devices. To further unsettle the turbulent waters in this area of federal tax law, the IRS Technical Advice Memorandum would disallow under I.R.C. § 163(a) the interest deductions taken on these COLI plans. *See* Tech. Adv. Mem., 1998 WL 123675 at 20. The Court holds the IRS has satisfied its burden of proving a "substantial and material consideration" of the tax law is required, rather than a mere straightforward application of tax law.[22]

---

**21.** The Court has been made aware of at least three other cases presenting similar issues of law and fact, one in the Tax Court and two others are in district courts within the Sixth Circuit Court

of Appeals. Insofar as is known, none of these cases has been definitively resolved.

**22.** Camelot's reliance on 11 U.S.C. § 505(a)(1) to support its argument that the Bankruptcy Court

## 2. Amounts Systematically Borrowed Under § 264(c)(1)

If it is determined under § 163(a) that Camelot's COLI plan gives rise to genuine indebtedness and interest for federal tax purposes, Camelot is still subject to the provisions of I.R.C. § 264(a)(3). Under this section, interest deductions are generally disallowed on amounts systematically borrowed from an insurance policy to finance the payment of the policy's premiums. *See* I.R.C. § 264(a)(3). However, under I.R.C. § 264(c)(1), the so-called "safe harbor provision", a taxpayer is relieved from this general disallowance where the taxpayer meets the following criteria:

> Subsection (a)(3) shall not apply to any amount paid or accrued by a person during a taxable year on indebtedness incurred or continued as part of a plan referred to in subsection (a)(3) ... if no part of 4 of the annual premiums due during the 7–year period (beginning with the date the first premium on the contract to which such plan relates was paid) is paid under such plan by means of indebtedness ....

I.R.C. § 264(c)(1). This safe-harbor test is referred to as the "4 out of 7" test.

Camelot argues that the issue is clear: either a policyholder has paid four of seven premiums with borrowed funds or it has not. The IRS disagrees with this characterization and observes that while Section 264(c)(1) provides that the interest disallowance rule of Section 264(a)(3) shall not apply "if no part of 4 of the annual premiums due during the 7–year period ... is paid under such plan by means of indebtedness," there is a disagreement between the parties over the legal in-terpretation of the operative language "annual premiums due." The IRS maintains that "annual premiums due" should be interpreted as meaning the nominal annual premiums due less the "loading dividends" that were offset against the contract premiums for billing purposes. Camelot, on the other hand, contends that "annual premiums due" means the contract-specified premiums.

This exact issue, the meaning of "annual premiums due" in § 264(c)(1) in a COLI plan context, has been addressed by the IRS in its March 20, 1998, Technical Advice Memorandum. *See* Tech. Adv. Mem., 1998 WL 123675 at 27–28. The IRS has taken the position that, "for purposes of section 264(c)(1), the 'annual premium due' under each COLI policy equals ... the annual premium on the specifications page of the policy reduced by the loading dividends." *Id.* However, this unsurprising holding by the IRS does not carry the day, as the meaning of the "annual premiums due" in 264(c)(1) has yet to be litigated in any federal court[23] and is therefore, another issue of first impression.[24]

Merely labeling a statutory term ambiguous is not sufficient to merit a "substantial and material consideration." A party must assert a good faith argument why the statute in contention requires meaningful and substantial consideration outside the Bankruptcy Code. The IRS has met its threshold burden by reason of the recently issued Technical Advice Memorandum and by pointing out that I.R.C. § 264(c)(1) has never been applied to a case with facts involving a COLI plan. *See* Docket Item 2 at 20–21, 27. Statutory interpretation of "annual premiums due" will require meaningful consideration of

could properly decide this tax issue is besides the point. 28 U.S.C. § 157(d) stands for the principle that even though a proceeding may be well within the jurisdiction of the Bankruptcy Court, there are some complex issues that require the relative expertise of the district court for their determination. *See Smith Corona*, 205 B.R. at 714 (citation omitted). The statute does not permit the district judge to act on his own knowledge that Bankruptcy Judge Walsh, an eminently capable jurist, could determine the merits of this tax litigation as well as this district judge.

23. By letter memorandum, Camelot now concedes the *Coors* case did not apply I.R.C. § 264(a)(3), or its safe-harbor exception, I.R.C.

§ 264(c)(1), and did not involve a COLI plan similar to the one employed by Camelot. *See Coors*, 572 F.2d at 831 n. 9.

24. Although the Ninth Circuit case of *Shirar v. Commissioner* did address I.R.C. § 264(c)(1) under a similar set of facts, the *Shirar* Court limited its discussion to whether this safe-harbor provision could apply to a life insurance policy not in fact carried out over the entire seven year period. *See Shirar*, 916 F.2d at 1420. Because *Shirar* found the "4 out of 7" test of 264(c)(1) satisfied under the factual circumstances of the case without a discussion or interpretation of the phrase "annual premiums due," it is unhelpful to the Court's present analysis. *See id.*

federal tax law and not a simple application of federal tax law to the facts of this case. It is held the IRS has fulfilled its burden of proving a "substantial and material consideration" of the tax law is required.

In conclusion, the Court finds there are two unsettled tax issues of first impression which require substantial and material consideration of federal tax law, outside the parameters of the Bankruptcy Code, in order to resolve this contested matter between Camelot and the IRS. Withdrawal of this contested matter is therefore mandatory under 28 U.S.C. § 157(d).

An appropriate order will issue.